UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DARNELL TURNER** | **CIVIL ACTION** |
| **VERSUS** | **NO. 18-11237** |
| **DARRELL VANNOY** | **SECTION "F"(2)** |

**REPORT AND RECOMMENDATION**

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the petition, this court has determined that a federal evidentiary hearing is unnecessary at this time. See 28 U.S.C. § 2254(e)(2).[1] For the following reasons, this court recommends that the instant petition for habeas corpus relief be **DISMISSED WITH PREJUDICE** as time-barred.

I. FACTUAL AND PROCEDURAL BACKGROUND

The petitioner, Darnell Turner, is incarcerated in the Louisiana State Penitentiary, Angola, Louisiana.[2] On June 17, 2010, Turner was charged by bill of indictment in

---

[1] Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination. Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

[2] Rec. Doc. No. 3-1.

Jefferson Parish with the second degree murder of Donald Bates in violation of La. Rev. Stat.§ 14:30.1.[3] The Louisiana Fifth Circuit Court of Appeal summarized the facts established at trial:

> On January 28, 2010, Donald Bates cashed a $12,000.00 check at Ace Check Cashing that he received for the sale of his vehicle. Rhonda Skinner was with Bates at the time he cashed the check. Before bringing Skinner to her home, Bates purchased marijuana and crack and gave her money to purchase a phone. Bates also offered Skinner money in exchange for sexual relations, which she refused but ultimately agreed to think about it. That night, Mr. Bates was counting the money with his wife, Caroline Bates, at their home at 2217 Eastmere Street, which is located in the Woodmere neighborhood. He told his wife that he wanted to use the money to pay traffic tickets, insure their truck, and obtain groceries. He placed $2,000.00 in an envelope for past-due rent, which was left on the kitchen table before Mrs. Bates left for work the next morning. Bates also gave his wife an additional $2,000.00 for the next two months' rent, which she hid in a guestroom within their residence.
> On the following morning of January 29, 2010, Mrs. Bates left their residence at approximately 6:00 a.m. to go to work. Bates was still in bed sleeping when she left. When she returned home from work that day at approximately 3:00 p.m., she noticed that her husband's van was not at their home. When she attempted to unlock the door to her residence, she noticed that the door was unlocked. Knowing her husband usually did not leave the door unlocked, she called a friend to come over to her house. She and a friend opened the glass door and noticed spots of blood on the floor, at which point they chose not to go inside and called the police.
> Deputy Jeffrey Easterby of the Jefferson Parish Sheriff's Office responded to Mrs. Bates' call at her residence. Once inside, Deputy Easterby noticed that the home had been ransacked, with the furniture disturbed, drawers pulled out with property removed, and mattresses flipped up. He discovered the victim, Bates, who did not appear to be alive, on the bathroom floor of the master bedroom. The victim was dead and had sustained multiple different types of traumatic injuries, including four gunshot wounds, blunt force trauma wounds, and superficial incised wounds.
> Detective Gary Barteet of the Jefferson Parish Sheriff's Office testified regarding the scene and the evidence seized from the residence. Based on the

---

[3]St. Rec. Vol. 1 of 9, Bill of Indictment, 6/17/10. Turner's co-defendants, Rhonda Skinner and Terrol Cole, were also charged in the bill of indictment.

presence of blood in multiple areas of the residence, the scene indicated that there had been a struggle in the foyer/hallway area, just past the front door, and that portions of the residence had been searched and left in disarray. The mattress had been pulled off of the bed, and a baseball bat was found on the box springs. Detective Barteet believed that there were at least two people involved due to the violence, which seemed to indicate that the victim was "striking back." He did not find any evidence that indicated there was forced entry. The police recovered four 9 mm fired cartridge cases, two of which were discovered in the hallway and the remaining two were discovered in the bathroom. A pillow was also found in the bathroom on the victim that had been penetrated by a passing bullet.

Once Mrs. Bates was allowed to return to her home, she noticed that a World War II plaque from her father was missing, as well as the $2,000 which had been left inside an envelope on the kitchen table. She also found a blood-covered knife inside a drawer of her home.

Dr. Susan Garcia, an expert in the field of forensic pathology, performed the autopsy on the victim and determined that one of the gunshots punctured his heart and went through his right lung, which she believed was a lethal wound. The victim had other gunshot wounds, including one to his leg. Dr. Garcia believed that the incised wounds to the victim's scalp, neck, and fingers were caused by a sharp object, possibly a knife. She further believed that the blunt force trauma to the victim's head was consistent with him being struck by a hard object, possibly a baseball bat.

Detective Solomon Burke of the Jefferson Parish Sheriff's Office testified that the victim's van was recovered on the night of the murder on a dead-end road near the intersection of Jordan Street and Ray Street, within the Haydel area. Someone had made an attempt to set the van on fire, but the fire was unsuccessful due to the fact that it was set inside of a sealed van. A baseball cap was found on the ground a few feet away from the driver's side door of the van. Detective Burke testified that he obtained an exigent circumstance request for the victim's cell phone. It was discovered that the last phone call received by the victim was from Rhonda Skinner. The phone traced Skinner's phone to a hotel, where she was found. The police recovered Skinner's phone, but the SIM card had been removed. Skinner was brought to the Detective Bureau as a person of interest where she gave seven taped statements over the course of approximately twenty-four hours, all of which were played for the jury at trial.

In Skinner's first statement, taken at 2:15 a.m. on January 31, 2010, she admitted that she knew the victim, and that she was with him on January 28, 2010 when he cashed his $12,000.00 check at Ace Check Cashing. She further admitted that she called him from her home in the Beechgrove area at approximately 8:00 a.m. on January 29, 2010 to discuss his previous offer of money in exchange for sex.

3

In her third statement at 2:11 p.m., Skinner admitted that her call to the victim on the morning of January 29, 2010 took place while she was in the same area where the victim's residence is located—the Woodmere area. She stated that she was in the Woodmere area to inspect an apartment for rent. While walking, a car stopped beside her with two males inside. She described the driver, and said that a man she knew as "Nasty" was in the passenger seat. She stated that Nasty advised her that he was about to "hit a lick," (meaning "to steal"), and that he was going to "get it" from the victim, whom he referred to as "Mr. Don." In her fourth statement, taken at 3:55 p.m., Skinner added that Nasty already knew that the victim had recently received a large sum of money for the sale of his car, and that he intended to knock on the victim's door and impersonate a lawn service worker. Once the victim opened the door, she stated that Nasty told her that he planned to force his way in.

In her fifth statement, given at 6:15 p.m., Skinner admitted that she had withheld some information from her prior statements. Specifically, she admitted that she had received a phone call from Nasty on the morning of January 29, 2010, wherein he asked her to meet him in the Woodmere area. She said that she called Mr. Don when she got to the Woodmere area, at around 8:00 a.m. She then said that Nasty called her a second time, and came to meet her in a vehicle. He was on the passenger's side and she said that the driver was someone she had never seen before. At Nasty's request, Skinner called the victim again at 8:53 a.m. to see if he was at his home. After her conversation with the victim, she again confirmed that Nasty told her he was going to "get a lick off of Mr. Don," which she understood to mean that he was going to take the money the victim had received the previous day, and that Nasty planned to get inside the house by pretending to be a lawn service worker. Skinner admitted that she confirmed to Nasty that the victim had the money, but she denied any involvement in the victim's murder. Although she did not know Nasty's real name, she did have information about his mother and his sister, from which the police were able to identify Nasty's real name as Terrol Cole. Thereafter, Skinner identified Terrol Cole as Nasty in a photographic lineup.

In another statement, which was given on January 31, 2010, at 9:33 p.m., Skinner admitted that she had held back information because she was scared of those involved and of going to jail. She stated that after she agreed to meet Cole in the Woodmere area on the morning of January 29, 2010, she met him at a house located within that area on Destrehan Avenue. She then went for a ride with Cole in a car driven by a female later identified as Katrice Batiste, and a man she knew as "Darnell." During the car ride, Cole told her about his plan to rob the victim. She said they passed Mr. Don's house on Eastmere Street, and that she saw Mr. Don's van at his home. Skinner further stated that the driver was told to stop at a stop sign near Eastmere Street, at which point Cole and "Darnell" exited the car. She eventually saw the two men walk back towards the victim's house.

4

She then returned to the house on Destrehan Avenue. Shortly thereafter, Skinner stated that she left the Destrehan Avenue house with Batiste and one other female later identified as Tanishia Stamps, and went to another house located on Marine Street in the Haydel area.

Once Skinner arrived at the Marine Street house, she stated that she observed Cole in the back of the residence, changing his clothes and sweating. She said that Cole told her that the victim opened the door, but stated that he only admitted to having $2,800.00. Cole told her that the victim and "Darnell" were struggling over the gun, and that he had to help Darnell by hitting the victim. She stated that "Darnell" told her that he shot the victim in the foot and that he "poked" him with a knife because he wouldn't cooperate. She said that Cole told her that they took the victim's van, which they intended to burn. Skinner's final statement was made in reference to a photographic lineup, in which she identified Defendant, Darnell Turner, as the other person involved in the murder named "Darnell."

Detective Burke testified that Skinner was arrested after her statements, which led to arrest warrants for Defendant and Cole. The investigation revealed that Defendant's residence was located at 3000 Destrehan Avenue and his father's residence was located at 1624 Marine Street. At trial, Skinner testified that she had entered into a plea agreement, wherein her second degree murder charge was reduced to conspiracy to commit armed robbery in exchange for her testimony in this case.

As previously provided in her recorded statements, she admitted that on January 29, 2010, she went to the Woodmere area with Katrice Batiste, Tanishia Stamps, Defendant, and Cole. She admitted that she and Cole had a conversation wherein she confirmed to him that the victim did have the money. While in the car, she testified that Cole talked to her about "hitting a lick" on the victim, and that Defendant was in the car at the time of this conversation. Skinner further testified that at some point Cole agreed to give her a $2000.00 cut from the victim's money.

She testified that after Cole instructed Batiste to stop the vehicle at a stop sign near the victim's house, Cole and Defendant exited the vehicle. Skinner and Batiste drove off and eventually returned to the house on Destrehan Avenue. After receiving a call from Cole, Skinner went to the house on Marine Street with Batiste and Tanishia Stamps. Skinner testified that she went to look for Cole and found him and Defendant in a room in the back of the house. Skinner testified that Cole told her that he "popped Mr. Bates cause he was struggling with Darnell" over a gun. She said she witnessed Cole put a plastic bag into the trunk of the car before they left the Marine Street house in Batiste's vehicle. Skinner testified that she identified Defendant in a photographic lineup at the Detective Bureau, and she also identified Defendant in court.

Detective Burke testified that he interviewed Batiste and Stamps, both of whom corroborated what was learned from Skinner. At trial, Batiste testified that

5

at the time of the incident, she had known Cole and Defendant for about a month. On the night before the victim's murder, Batiste testified that she and Stamps spent the night at the Marine Street house with Cole and Defendant. When they woke up on January 29, 2010, they picked up Skinner and went to Defendant's house at 3000 Destrehan. Later that morning, Batiste, Skinner, Defendant, and Cole left Defendant's house in her car, and she and Skinner dropped off Defendant and Cole on Post Street in the Woodmere area.

Batiste testified that she, Skinner, and Stamps went to the Marine Street house to meet Cole and Defendant later that same day. She noticed that both Defendant and Cole had changed their clothes. When Batiste sat on the sofa, she testified that she almost burned her arm on a pistol, which was hot to the touch.

A few days later, Batiste and Stamps picked up Defendant and drove to Baton Rouge to meet up with Cole. Defendant stayed in Baton Rouge with Cole, but Katrice and Tanishia went home. Batiste and Stamps eventually drove Cole and Defendant to Little Rock, Arkansas, and stayed there for a few days. She explained that Stamps reserved the hotel rooms because Defendant and Cole did not want to use their identifications. While in Little Rock, Batiste asked Cole about the "hot gun" that she found on the sofa at the Marine Street house. He told her that it was hot because he put a pillow over the victim's face and "hit it" five times.

Batiste and Stamps were arrested in Batesfield, Mississippi on their way home. Batiste gave the police information regarding Defendant and Cole, which Detective Burke explained included specific details that matched the crime scene and had not been provided to anyone. As a result, Defendant and Cole were later captured in Arkansas with the assistance of the U.S. Marshals Fugitive Recovery Task Force.

Adriana Perez testified as an expert in the field of forensic DNA analysis and prepared a report regarding the items she tested that were recovered during the homicide investigation. She testified that she obtained a mixed DNA sample from the baseball cap recovered near the victim's van, which could be explained by multiple people wearing the cap. She determined that approximately 99.9% of the entire population could be excluded as a possible donor of the DNA found on the baseball cap, but that Defendant could not be excluded as a donor.

Susan Johnson, custodian of records for T–Mobile, testified regarding subscriber information, call detail records, and cell site information. She also testified regarding a map with cell towers and their locations. Ms. Johnson testified that between January 29, 2010 and January 30, 2010, multiple calls were made between Defendant, Cole and Skinner.

Defendant testified at trial and admitted his prior convictions. He testified that his mother owned the house located at 3000 Destrehan Avenue, which was where he was living at the time of the incident, and that his father rented the house located at 1624 Marine Street. Defendant testified that on January 28, 2010, he, Cole, Batiste and Stamps spent the night at his father's house at Marine

6

>Street. Defendant testified that on January 29, 2010, they left the Marine Street house after 8:00 a.m., went to pick up Skinner in Batiste's car, and then went to his house at 3000 Destrehan Avenue. After about thirty minutes, he testified that Cole, Batiste, Stamps and Skinner left his house on Destrehan Street, while Defendant remained there until 4:45 p.m. He testified that he did not hear from them again until approximately 6:00 p.m., at which time Defendant was at his father's house on Marine Street. Defendant then took his father's vehicle and picked up Cole at Cole's mother's house. Defendant and Cole spent the night at the Marine Street house with Tanishia and Katrice, who later joined them.
>    Defendant denied ownership of the baseball cap found near the victim's van, but admitted that it was shown that his DNA was on the hat. He testified that he could have come into contact with the cap, but he claimed he was not the only person who used his clothing. Defendant denied ever seeing the victim or being inside the victim's residence. He denied any knowledge that Cole was planning to rob Bates, or that he and Cole were dropped off at an intersection near the victim's house on the day of the incident.
>    On cross-examination, Defendant was confronted with evidence that his cell phone records showed that he was in the Haydel area at around noon on January 29, 2010, which was the same time that he claimed to be at his Destrehan home, which is located in the Woodmere area. Defendant testified that he could have dropped his phone in Batiste's car earlier that day, and that he in fact got his phone back when Batiste and Stamps returned to the Marine Street house later that day.

State v. Turner, 138 So.3d 740, 741-746 (La. App. 5th Cir. 2014); State Record Volume 8 of 9, Louisiana Fifth Circuit Court of Appeal Opinion,13-KA-836, pages 2-11, March 26, 2014.

Turner was tried before a jury on April 9 through 12, 2013, and found guilty as charged.[4] At an April 23, 2013 hearing, the state trial court denied Turner's motion for

---

[4] St. Rec. Vol. 1 of 9, Trial Minutes, 4/9/13; Trial Minutes, 4/10/13; Trial Minutes, 4/11/13; Trial Minutes 4/12/13; Jury Verdict, 4/12/13; St. Rec. Vol. 6 of 9, Trial Transcript, 4/9/13; Trial Transcript, 4/10/13; St. Rec. Vol. 7 of 9, Trial Transcript (con't), 4/10/13; Trial Transcript, 4/11/13; St. Rec. Vol. 8 of 9, Trial Transcript (con't) 4/11/13; Trial Transcript, 4/12/13.

new trial.[5]  At the same hearing, the state trial court sentenced Turner to life in prison without benefit of parole, probation or suspension of sentence,[6] and denied Turner's motion to reconsider sentence.[7]

On direct appeal, Turner's appointed counsel asserted that the evidence presented at trial was insufficient to convict him of second degree murder.[8] On March 26, 2014, the Louisiana Fifth Circuit affirmed Turner's conviction, finding his claim meritless, but remanded the case for the Uniform Commitment Order to be corrected to reflect the correct date of the offense, January 29, 2010.[9]

The Louisiana Supreme Court denied Turner's related writ application without stated reasons on December 8, 2014.[10]  His conviction became final under federal law ninety (90) days later on, March 9, 2015,[11] when he did not file a writ application with

---

[5]St. Rec. Vol. 1 of 9, Motion for New Trial, 4/23/13; Order, 4/23/13; Sentencing Minutes, 4/23/13; St. Rec. Vol. 8 of 9, Sentencing Transcript, 4/23/13.

[6]St. Rec. Vol. 1 of 9, Sentencing Minutes, 4/23/13; Uniform Commitment Order, 4/23/13; St. Rec. Vol. 8 of 9, Sentencing Transcript, 4/23/13.

[7]St. Rec. Vol. 1 of 9, Motion to Reconsider the Sentence, 4/23/13; Order, 4/23/13; Sentencing Minutes, 4/23/13; St. Rec. Vol. 8 of 9, Sentencing Transcript, 4/23/13.

[8]St. Rec. Vol.8 of 9, Appeal Brief, 13-KA-836, 11/7/13.

[9]Turner, 130 So.3d 746-749; St. Rec. 8 of 9, 5th Cir. Opinion, 13-KA-836, pp. 11-17, 3/26/14. The Commitment was amended on April 3, 2014.  St Rec. Vol. 1 of 9, Amended Commitment, 4/3/14; Uniform Commitment Order, 4/3/14.

[10]State v. Turner, 153 So.3d 438 (La. 2014); St. Rec. Vol. 8 of 9, La. S. Ct. Order, 2014-KO-0887, 12/8/14.  St. Rec. Vol. 9 of 9, La. S. Ct. Writ Application, 4/28/14 (dated 4/22/14).

[11]The 90th day was Sunday, March 8, 2015.  The deadline therefore fell to the next business day, Monday, March 9, 2015.  See La. Code Crim. P. art. 13 (weekends and holidays not included in calculation when it would be the last day of the period); Fed. R. Civ. P. 6(a)(2)(C).

8

the United States Supreme Court. See Erickson v. Davis, 895 F.3d 372, 375 (5th Cir. 2018) (quoting Roberts v. Cockrell, 319 F.3d 690, 693-694 (5th Cir. 2003) ) (" '[A] decision becomes final by the conclusion of direct review or the expiration of the time for seeking such review.' ... 'If the conviction does not become final by the conclusion of direct review, it becomes final by the expiration of the time for seeking such review.' ... Therefore, the date [when petitioner's] conviction became final, and the date that must be used to calculate [his] one-year deadline for filing a § 2254 petition, is ... 90 days after the" conviction became final in the state courts and he failed to seek certiorari in the United States Supreme Court.); U.S. Sup. Ct. Rule 13(1); accord Catchings v. Fisher, 815 F.3d 207, 209 (5th Cir. 2016); Palacios v. Stephens, 723 F.3d 600, 604 (5th Cir. 2013); Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999).

On January 15, 2016, 312 days after his conviction became final, Turner signed and submitted to the state trial court an application for post-conviction relief.[12] In that application, Turner asserted: (1) He received ineffective assistance of trial and appellate counsel. (2) The indictment was defective as it failed to include the essential elements of second degree murder. (3) La. Code Crim. P. art. 782(A) is unconstitutional in allowing conviction by a non-unanimous verdict. (4) The indictment was obtained by perjured testimony. On May 18, 2016, the state trial court denied relief finding no merit in his ineffective assistance of counsel claims and his remaining claims procedurally

---

[12]St. Rec. Vol. 2 of 9, Application for Post-Conviction Relief, 1/21/16 (dated 1/15/16).

9

barred pursuant to La. Code Crim. P. Art. 930.4(B).[13]  After Turner filed a notice of intent to take writs and a request for a return date, the state trial court set a return date for August 5, 2016.[14]

On July 14, 2016, the Louisiana Fifth Circuit denied Turner's writ application, finding no merit in his ineffective assistance of counsel claim and his remaining claims procedurally barred pursuant to La. Code Crim. P. art. 930.4(B).[15]  On November 28, 2017, the Louisiana Supreme Court denied Turner's related writ application, finding that he had shown no error in the lower court rulings.[16]

## II.   FEDERAL HABEAS PETITION

Almost one year later, on November 13, 2018, Turner submitted to his court hte instant petition for federal habeas corpus relief in which he asserts the same claims he raised in his state court direct appeal and application for post-conviction relief:[15]  (1) Insufficient evidence supported his conviction.  (2) He received ineffective assistance of trial and appellate counsel.  (3) The indictment was invalid for failure to include the

---

[13]St. Rec. Vol. 2 of 9, Trial Court Order, 5/18/16.

[14]St. Rec. Vol 2 of 9, Notice of Intent to Take Writs, 6/9/16 (dated 6/6/16); Request to Set a Return Date, 6/9/16 (dated 6/6/16), Trial Court Order, 6/21/16

[15]St. Rec. Vol. 9 of 9, 5th Cir. Order, 16-KH-365,7/14/16.  The state court record does not include a copy of the related writ application.

[16]State ex rel. Turner v. State, 230 So.3d 198 (La. 2017) (per curiam); St. Rec. Vol. 8 of 9, La. S. Ct. Order, 2016-KH-1575, 11/28/17; St. Rec. Vol. 9 of 9, La. S. Ct. Writ Application, 8/16/16 (dated 8/2/16).

[15]Rec. Doc. 3-1, pp. 4-25.

10

essential elements of the offense. (4) La. Code Crim. P. art. 782(A) is unconstitutional in allowing conviction by a non-unanimous verdict. (5) The indictment was obtained through the use of perjured testimony. The State filed a response in opposition to Turner's petition, arguing that the petition was untimely filed under federal law and that Claims Nos. 3, 4 and 5 are procedurally barred.[16]

III.   GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254. The AEDPA went into effect on April 24, 1996[17] and applies to habeas petitions filed after that date. Flanagan v. Johnson, 154 F.3d 196, 198 (5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)). The AEDPA therefore applies to Turner's petition, which, for reasons discussed below, is deemed filed in a federal court on November 13, 2018.[18]

---

[16] Rec. Doc. No. 13.

[17] The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir. 1992).

[18] The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. Coleman v. Johnson, 184 F.3d 398, 401 (5th Cir. 1999), cert. denied, 529 U.S. 1057 (2000); Spotville v. Cain, 149 F.3d 374, 378 (5th Cir. 1998); Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995). The clerk of court actually filed Turner's federal habeas petition on December 17, 2018, when the filing fee was received. However, Turner certified under penalty of perjury that he placed the original pleadings into the prison mail system on November 13, 2018. Rec. Doc. No. 3, p. 16. He has declared this to be the date on which he delivered the pleadings to prison officials for mailing. The fact that he paid the filing fee on a later date

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether petitioner's claims were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim. Nobles v. Johnson, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

The State has asserted that Turner's federal petition was not timely filed and that three of his claims are procedurally barred. The State did not address the merits of any of his claims. For the following reasons, the record supports the State's conclusion that the petitioner is untimely, and Turner's petition should be dismissed because it is time-barred.

IV.   STATUTE OF LIMITATIONS

The AEDPA requires a petitioner to bring his Section 2254 petition in most cases within one year of the date his conviction became final.[19]   Duncan v. Walker, 533 U.S.

---

does not alter the application of the federal mailbox rule to his pro se petition. See Cousin v. Lensing, 310 F.3d 843, 847 (5th Cir.2002) (mailbox rule applies even if inmate has not paid the filing fee at the time of mailing) (citing Spotville, 149 F.3d at 378).

[19]The statute of limitations provision of the AEDPA at 28 U.S.C. § 2244(d), provides for other triggers which do not apply here:

> (1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
> A. the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> B. the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State actions;
> C. the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made

167, 179-80 (2001). As discussed above, Turner's conviction became final for AEDPA purposes on March 9, 2015. Thus, under a literal application of the statute, Turner had one year from the date his conviction became final, until March 9, 2016, to file his federal habeas corpus petition, which he did not do. His petition must be dismissed as untimely, unless the one-year statute of limitations period was interrupted or otherwise tolled in either of the following two ways recognized in the applicable law.

First, the United States Supreme Court has held that the one-year statute of limitations period in Section 2244(d)(1) of the AEDPA may be equitably tolled only when the petitioner has pursued his rights diligently and rare or extraordinary circumstances exist which prevented timely filing. Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005); Fisher v. Johnson, 174 F.3d 710, 713 (5th Cir. 1999), cert. denied, 531 U.S. 1164 (2001); Cantu–Tzin v. Johnson, 162 F.3d 295, 299 (5th Cir. 1998); Davis v. Johnson, 158 F.3d 806, 810 (5th Cir. 1998), cert. denied, 526 U.S. 1074 (1999). Equitable tolling is warranted only when the petitioner was actively misled or is prevented in some extraordinary way from asserting his rights. Pace, 544 U.S. at 418–19; Cousin v. Lensing, 310 F.3d 843, 848 (5th Cir. 2002).

---

retroactively applicable to cases on collateral review; or
D. the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Turner has asserted no reason, and I can find none, that might constitute rare or exceptional circumstances why the one-year statute of limitations period should be considered equitably tolled in his case. The record does not establish circumstances that might fit the restrictive boundaries of "exceptional circumstances" described in binding precedent to warrant equitable tolling in this case. See Holland v. Florida, 560 U.S. 631, 651-54 (2010) (equitable tolling would be warranted where attorney was more than negligent when he failed to satisfy professional standards of care by ignoring the client's requests timely to file a federal petition and in failing to communicate with the client over a period of years in spite of the client's letters); Hardy v. Quarterman, 577 F.3d 596, 599-600 (5th Cir. 2009) (equitable tolling was warranted where petitioner suffered a significant state-created delay when, for nearly one year, the state appeals court failed in its duty under Texas law to inform him that his state habeas petition had been denied, petitioner diligently pursued federal habeas relief, and he persistently inquired to the court.); United States v. Wynn, 292 F.3d 226 (5th Cir. 2002) (tolling warranted when defendant was deceived by attorney into believing that a timely motion to vacate was filed); Coleman v. Johnson, 184 F.3d 398, 402 (5th Cir. 1999), cert. denied, 529 U.S. 1057 (2000) ("A garden variety claim of excusable neglect does not support equitable tolling."); Fisher, 174 F.3d at 715 (tolling not justified during petitioner's 17-day stay in psychiatric ward, during which he was confined, medicated, separated from his glasses and thus rendered legally blind, and denied meaningful access to the courts); Cantu-Tzin,

14

162 F.3d at 300 (State's alleged failure to appoint competent habeas counsel did not justify tolling); Davis, 158 F.3d at 808 n.2 (assuming without deciding that equitable tolling was warranted when federal district court three times extended petitioner's deadline to file habeas corpus petition beyond expiration of AEDPA grace period).

In addition to equitable tolling, however, the AEDPA itself provides for interruption of the one-year limitations period, in stating that "[t]he time during which <u>a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward</u> any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2) (emphasis added). By its plain language, this provision does not create a new, full, one-year term within which a federal habeas petition may be filed at the conclusion of state court post-conviction proceedings. Flanagan v. Johnson, 154 F.3d 186, 99 n. 1 (5th Cir. 1998). The Supreme Court has clearly described this provision as a tolling statute. Duncan v. Walker, 533 U.S. 167, 175–78 (2001).

The Fifth Circuit and other federal courts have held that, because this statute is a tolling provision, the time during which state court post-conviction proceedings are pending must merely be subtracted from the one-year limitations period:

> [Section] 2244(d)(2) provides that the period during which a properly filed state habeas application is pending must be excluded when calculating the one[-]year period. Under the plain language of the statute, any time that passed between the time that [petitioner's] conviction became final and the time that his state application for habeas corpus was properly filed must be counted against the one[-]year period of limitation.

15

Flanagan, 154 F.3d at 199 n. 1; accord Brisbane v. Beshears, 161 F.3d 1, 1998 WL 609926 at *1 (4th Cir. Aug.27, 1998) (Table, Text in Westlaw); Gray v. Waters, 26 F. Supp.2d 771, 771–72 (D. Md. 1998).

For a post-conviction application to be considered "properly filed" within the meaning of Section 2244(d)(2), the applicant must " 'conform with a state's applicable procedural filing requirements,' " such as timeliness and location of filing. Williams v. Cain, 217 F.3d 303, 306-07 & n.4 (5th Cir. 2000) (quoting Villegas v. Johnson, 184 F.3d 467, 469 (5th Cir. 1999) ) (citing Smith v. Ward, 209 F.3d 383, 384-85 (5th Cir. 2000) ); see also Pace, 544 U.S. at 414 ("When a postconviction application is untimely under state law, 'that [is] the end of the matter' for purposes of § 2244(d)(2)"). The timeliness consideration in Louisiana, for purposes of the AEDPA, requires application of a prison mailbox rule to state pleadings. Causey v. Cain, 450 F.3d 601, 604–05 (5th Cir. 2006).

A matter is "pending" for Section 2244(d)(2) purposes "as long as the ordinary state collateral review process is 'in continuance.'" Carey v. Saffold, 536 U.S. 214, 219–20 (2002); Williams, 217 F.3d at 310 (a matter is "pending" for Section 2244(d)(2) purposes until "further appellate review [is] unavailable under [Louisiana's] procedures."

The phrase "other collateral review" in the statute refers to state court proceedings challenging the pertinent judgment subsequently challenged in the federal habeas petition. Dillworth v. Johnson, 215 F.3d 497, 501 (5th Cir. 2000) (state habeas petition challenging a prior conviction in one county was other collateral review even though

16

filed as a challenge to a second conviction in a different county); Nara v. Frank, No. 99–3364, 2001 WL 995164, at *5 (3rd Cir. Aug.30, 2001), overruled in part on other grounds by Carey v. Saffold, 536 U.S. 214 (2002) (motion to withdraw a guilty plea is "other collateral review"). A "pertinent judgment or claim" requires that the state filings for which tolling is sought must have challenged the same conviction being challenged in the federal habeas corpus petition and must have addressed the same substantive claims now being raised in the federal habeas corpus petition. Godfrey v. Dretke, 396 F.3d 681, 686–88 (5th Cir. 2005).

In Turner's case, the one-year AEDPA limitations period began to run on March 10, 2015, the day after his conviction became final. The limitations period ran without interruption for 312 days, until January 15, 2016, when Turner's state court post-conviction application was deemed filed in the state trial court. His post-conviction application and subsequent review remained pending in the state courts until November 28, 2017, when the Louisiana Supreme Court denied his writ application. The AEDPA one-year limitations period began to run again the next day, November 29, 2017, and did so uninterrupted until January 22, 2018, when it expired.[20] Turner had no other properly filed application for state post-conviction relief or other collateral review during that time period that might have tolled the AEDPA one-year statute of limitations.[21]

---

[20]The last day was Saturday, January 20, 2018, which extended the last day of the period to the next business day, Monday, January 22, 2018. Fed. R. Civ. P. 6(a)(1)(C).

[21]The state court record includes an application for post-conviction relief dated November 17, 2015. St. Rec. Vol. 2 of 9, Application for Post Conviction Relief, dated 11/17/15. Nothing in the record

17

Under the mailbox rule, Turner's federal petition is deemed filed on November 13, 2018, which was 295 days <u>after</u> the AEDPA one-year statute of limitations expired on January 22, 2018. His federal petition was <u>not</u> timely filed and must be dismissed with prejudice for that reason.[22]

## RECOMMENDATION

For the foregoing reasons, **IT IS RECOMMENDED** that Turner's petition for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DISMISSED WITH PREJUDICE** as time-barred.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v.</u>

---

demonstrates that the application was ever filed with the state trial court. The application does not include a file stamp and Turner did not sign or date the certificate of service. <u>Id.</u>, at p. 28. By order dated December 1, 2015, the state trial court advised that there was no pending application for post-conviction relief and declined to appoint counsel. St. Rec. Vol. 2 of 9, Trial Court Order, 12/1/15. Even if this court were to toll the statute of limitations on November 17, 2015 and credit Turner with an additional 66 days, the statute of limitations would have run on March 28, 2018, and his habeas application would be 230 days late.

[22]Turner has asserted no excuse to avoid the expiration of the limitations period. Even if he were to argue actual innocence, Turner has not presented any new, reliable evidence of his innocence to meet the high burden set forth in <u>McQuiggin v. Perkins</u>, 569 U.S. 383 (2013).

United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).

New Orleans, Louisiana, this \_\_\_\_13th\_\_\_\_ day of May, 2019.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE